1

E6H8MCCS

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4                 v.                        12 Cr. 384 (KMW)

5   MARK McCORRISON,

6                 Defendant.

7   ------------------------------x

8                                           June 17, 2014
                                            11:25 a.m.
9
    Before:
10
                        HON. KIMBA M. WOOD
11
                                            District Judge
12
                              APPEARANCES
13
    PREET BHARARA
14       United States Attorney for the
         Southern District of New York
15  MICAH SMITH
         Assistant United States Attorney
16
    KREINDLER & KREINDLER
17       Attorneys for Defendant
    MEGAN W. BENETT
18

19

20

21

22

23

24

25

```
 1              (Case called)

 2              THE DEPUTY CLERK:  Will counsel please state their

 3     appearances for the record?

 4              MR. SMITH:  Good morning, your Honor.  Micah Smith for

 5     the government.

 6              THE COURT:  Good morning.

 7              MS. BENETT:  Good morning.  Megan Benett on behalf of

 8     Michael McCorrison, who is seated at counsel table to my right.

 9              THE COURT:  Good morning.

10              And good morning, Mr. McCorrison.

11              THE DEFENDANT:  Good morning.

12              THE COURT:  I have just received your letter, which I

13     have just read.

14              Once I have heard from defense counsel and defendant,

15     I will be asking Mr. Smith about the sentencings of comparably

16     situated defendants in the case so that I can follow 3553 to

17     the letter, and that may take a little time.  I don't know if

18     you have those in mind.

19              MR. SMITH:  I have some, your Honor.  I can collect

20     all as we are going along.

21              THE COURT:  Thank you.

22              At this point, I would like to ask Ms. Benett, have

23     you and your client had an adequate opportunity to review the

24     presentence report?

25              MS. BENETT:  We have, your Honor.
```

E6H8MCCS

1          THE COURT:  Do you have any changes you want me to

2    make?

3          MS. BENETT:  The only change, which I believe I noted

4    in the sentencing memorandum, was with respect to the section

5    addressing remand should the Court impose an incarceratory

6    sentence.  That I believe is the final paragraph on page 25,

7    where the report says that Mr. McCorrison was detained without

8    bail since his arrest, which is incorrect.  He is in fact a

9    candidate for voluntary surrender.

10          THE COURT:  We will strike in the next sentence the

11    word "not."

12          MS. BENETT:  Thank you, your Honor.

13          THE COURT:  That last sentence will read, "He is a

14    candidate for voluntary surrender."

15          MS. BENETT:  Thank you.

16          THE COURT:  All right.  At this point, I would be glad

17    to hear anything that you, Ms. Benett, and your client wish to

18    say.

19          MS. BENETT:  Thank you, your Honor.

20          At the risk of repeating to some extent what was

21    presented in the sentencing memorandum, I would like to add a

22    little bit of flavor to what we have already discussed with the

23    Court.

24          I would start by noting that Mr. McCorrison's father

25    and sister are in the audience today having travelled with him

E6H8MCCS

1   from Connecticut to support him during the sentencing.

2           THE COURT:  We welcome you.

3           MS. BENETT:  I think that is an appropriate segue to

4   talking a little bit about the changes in Mark's life over the

5   course of this case.

6           As the Court knows from our submission earlier, Mark

7   had a troubled family situation during his earlier years, and

8   without belaboring that, I think it is fair to say that some of

9   what he went through with his mother began to manifest itself

10  in some of the very bad decisions that he was making in the

11  late 2000s, starting around 2008 and 2009.  And as you can see

12  from the presentence investigation report, this is sort of the

13  cluster of time when Mark begins to get into real trouble.  His

14  mother passes away, his good friend Ed Kennison is killed in a

15  mass shooting at a beer distributor in the Hartford area.

16          THE COURT:  At a what?

17          MS. BENETT:  Ed Kennison.

18          THE COURT:  There was a word I didn't understand.

19          MS. BENETT:  Ed Kennison, who was a very good friend

20  of Mark, was killed in a mass shooting at a beer distributor in

21  the Hartford area, right around the same time that Mark's

22  mother had passed away, and also right around the same time

23  that his long-term girlfriend ended the relationship.  It's at

24  that time that Mark returns to some of the gambling that he had

25  done earlier when he was in college, but really sort of loses

E6H8MCCS

1    himself in it.

2           As the Court knows from our submission, Mark's mother

3    struggled with alcohol dependence and addiction, and to the

4    extent that some of those predilections are inherited, I think

5    it has manifested itself for Mark in the form of gambling.  And

6    he embarks on just an all-absorbing life of these illicit poker

7    games, visits to Foxwoods and Mohegan Sun, and he finds

8    himself, as many compulsive gamblers do, further and further in

9    the hole, and to support his habit he begins committing crimes.

10          As the Court can see from the presentence

11   investigation report, these are the sorts of crimes that one

12   might expect from a person who is again sort of lost in the

13   miasma of this gambling addiction.  He is issuing bad checks.

14   He is taking money from others.  In some ways, the most

15   outrageous conduct is in paragraphs 62 through 64, when Mark

16   was working with a disabled adult whose disability check Mark

17   endorsed to himself.  And I just would like to note, over the

18   time since that offense was committed, Mark has actually repaid

19   that individual to the full amount.  I believe he repaid the

20   victim $7,213.  And I mention that because I think it is an

21   insight into what Mark is capable of moving forward.

22          So when this case first -- at its inception, Mark came

23   voluntarily from Connecticut, along with his codefendants,

24   voluntarily surrendered and embarked on the prosecution here, I

25   would say without a full appreciation of the seriousness of the

E6H8MCCS

charges and of his situation.  And for the first six to eight

months Mark was making his court appearances and was

responsive, but had not necessarily come to terms with how this

case would change his life.  In fact, he committed at least one

additional offense with his codefendants after initially

appearing in magistrate court.

Over the course of two to three months after that,

when he had almost an epiphanal understanding that his life had

changed permanently and inexorably, he embarked on an effort to

cooperate with the government.  And I think that's important,

not just because it allowed the government to present the 5K1

letter to the Court, but most importantly, it forced Mark to

sever the relationship with his codefendants.

And once he did that, everything began to change.  He

moved in with his sister Tanya, who has opened her home along

with her husband, giving him a stable place to live.  He

continues to work on repairing the relationship with his

father, to this day is one of his employers.  He came down for

several meetings with the government.  He frequently would get

in touch with me when he had additional information from his

codefendants who kept texting him and calling him, and though

he knew not to have any contact with them and would not return

any of their calls, he assiduously kept in touch with me any

time there was any outreach to him, and I communicated that to

the government.

E6H8MCCS

1          I would say that from about six months into this case,

2     Mark became a different person that I had seen from the time of

3     his arrest, and having had conversations with his family

4     members and his employers, he has been a different person over

5     the last 18 months than he was for several, several years

6     before this case began.

7          He additionally started attending the Gamblers

8     Anonymous meetings on his own accord.  That was not a condition

9     of his pretrial release, but he recognized that the conduct and

10    the compulsion that he had with the gambling was never going to

11    be resolved without some assistance.  He sought out that

12    counseling.  I have gotten the letter from his sponsor at

13    Gamblers Anonymous and we have exchanged messages, although I

14    have not had a chance to speak with him individually.  But I

15    also did talk to his other two employers, Brian Caffrey and

16    Mark Albert, who had nothing but positive things to say about

17    what Mark has done over the last year and a half.

18         Mark Albert said that his work ethic is not just

19    commendable, but Mark is one of the most driven, committed

20    umpires he has seen in his organization, not just with the paid

21    work, but with the charity organizing that he does.  Brian

22    Caffrey says that Mark's attitude, even though he is doing

23    really entry level work, for a young man with a college degree,

24    who had hopes of some day working in law enforcement, a dream

25    that is diminished if not extinguished entirely, to have the

E6H8MCCS

willingness and enthusiasm even to do this work, where he is

getting much less money than he was when he was committing

misconduct, I think speaks volumes to the potential for

rehabilitation that we have here.

He met again, as the Court knows, several times with

the government.  He would have met more times.  In fact, I

reached out to the FBI agent on this case in the fall or winter

when I was on maternity leave because Mark was eager to

continue with these efforts to the extent that he could.  There

is no question that he has turned a corner, and he is not

having anything to do with his codefendants, and he is doing

everything he can to stay on a straight and narrow path.

His employment situation now would allow him to

continue, if he did not get an incarceratory sentence, he would

be able to continue working at these three jobs which allows

him to earn money not just to support himself and contribute to

the public, but most importantly in this case, to contribute

toward the restitution that is owed to the victims of this

case.  A probationary sentence would also allow him to continue

the efforts to repair the relationship with his family and his

friends in a much more direct way than might be possible were

he to be incarcerated.  Most importantly, a probationary

sentence would ensure that he is being watched during that

period of time, not just by the probation department, but by

this Court.

E6H8MCCS

1          His family, with whom I have spoken extensively about

2     the possible sentencing options in this case, his family has

3     said to me that they will not hesitate to contact probation or

4     me or the Court should he remain in the community and things

5     not continue as they have been continuing.  And part of the

6     reason they are here today is so that the Court can see

7     firsthand their commitment to their family member, to their son

8     and their brother, but also their commitment to helping him

9     with the changes that he has already started to make, and

10    helping to make sure that should something go wrong, they will

11    communicate that information to all interested parties.

12          The codefendants in this case have made certain

13    threats, or some codefendants have made threats to Mark once

14    they pieced together that he was cooperating with the

15    government.  Nevertheless, in the face of that, he has

16    continued both to cooperate with the government and to stay out

17    of trouble, and he has resisted their entreaties to return to

18    some of their activities earlier in this case.

19          THE COURT:  What were the threats?

20          MS. BENETT:  I believe it was Timothy McDorman's

21    brother would text Mark and say, we know that you're

22    cooperating.  I communicated them to the government.  They

23    didn't seem to take a step beyond verbal intimidation, but

24    there were some threats of physical violence, but again, those

25    were not backed up by any actual efforts to approach Mark or

E6H8MCCS

1    his family members.  But there were communications, phone
2    calls, voice mail messages and text messages, about wanting to
3    see Mark and about the possibility of fistfights and that sort
4    of thing.  Certainly, in the scheme of those types of threats
5    that cooperating witnesses face in federal prosecutions, I
6    would say it was not the most intimidating, but nevertheless,
7    for a person who has never been in this situation, it could
8    have deterred him and it didn't.
9              I would say that the best evidence of Mark
10   McCorrison's potential for rehabilitation is his conduct over
11   the last 18 months, and we would ask this Court to allow him to
12   continue with those positive steps and impose a probationary
13   sentence here.
14             THE COURT:  Thank you.
15             Mr. McCorrison, there is no requirement for you to say
16   anything, but if you would like to speak, I would be glad to
17   hear you now.
18             THE DEFENDANT:  I just wanted to say that I take full
19   responsibility for what I have done, not only to the victims
20   and the companies, but to my family and to the Court.  I have
21   made some horrible decisions, and I am truly sorry for what I
22   have put everybody through.
23             THE COURT:  Thank you.
24             Would the government like to be heard?
25             MR. SMITH:  Yes, your Honor.

1          I won't rehash the information and points we have made

2     in our sentencing letter, although I would be glad to answer

3     any questions about that.

4          I think the bottom line of the letter is that Mr.

5     McCorrison did provide substantial assistance, that he was

6     prepared to testify had there been a trial in this case for any

7     of the defendants, and he made that clear both himself and

8     through counsel.  He was prepared to testify at a Fatico

9     hearing if any of the defendants requested it, which was a

10    distinct possibility at the time, in part because Mr.

11    McCorrison was very helpful in laying out the frequency of

12    trips and how the conspiracy operated, which was part of what

13    the government was able to rely on in coming up with loss

14    numbers, which in this case was difficult because not all of

15    the victim retailers kept good records or were able to connect

16    necessarily losses that were happening at stores to this

17    particular conspiracy, and of course some victim retailers were

18    not cooperative at all.  So for a variety of reasons, Mr.

19    McCorrison's assistance was substantial.

20         As the Court is aware, none of the defendants decided

21    to proceed to trial or to request, at least to date, Fatico

22    hearings.  Mr. McCorrison is still available to testify in the

23    very unlikely possibility that there were one in the future,

24    though in light of the way in which these cases have been

25    disposed, that's a fleeting possibility.

E6H8MCCS

1          To go straight to the Court's question that was raised

2     earlier, so far, according at least to my records, five other

3     defendants in this case have been sentenced.  One defendant's

4     charges were nolle'd as a result of his untimely death, and

5     there are four defendants whose sentencings are still pending.

6          With respect to the five who have been sentenced, the

7     most severe sentence so far was given to codefendant Timothy

8     McDorman, who was given a 36 month sentence with three years of

9     supervised release.  As I think both the government's

10     sentencing letter and even Mr. McDorman's own allocution made

11     clear, Mr. McDorman is a very intelligent individual, and he

12     used his talents to further, unfortunately, this criminal

13     scheme.  In fact, Mr. McDorman was one of, as I would describe

14     it, the most heavily involved in the conspiracy, not the most,

15     and the Court has not yet sentenced the individual who is the

16     most heavily involved, who is Gregory Ryan, who is at the top

17     of the indictment.  But Mr. McDorman was very heavily involved,

18     and as the government's letter indicates, Mr. McDorman and

19     Mr. Ryan were the ones who recruited Mr. McCorrison into the

20     scheme in the first place.

21          At first, Mr. McCorrison's participation was limited

22     both in terms of its frequency and in terms of what he actually

23     did.  He was the returner, so to speak.  Mr. McCorrison is also

24     a very intelligent person, very articulate, has a lot of

25     potential, and some of those same attributes made him quite

E6H8MCCS

good at the task that Mr. Ryan and others had assigned to him.
I think the fact that Mr. McCorrison is a very intelligent
person also made him aware at a certain point that he was not
getting compensated for his talent, so to speak, and so he
demanded a larger role, and Mr. Ryan and others provided that
role to him.  So the number that you see both for the intended
and foreseeable losses, and also for the forfeiture number, is
largely a result of the fact that Mr. McCorrison was very good
at one particular task and that he did that repeatedly.

So I think although if you take the numbers alone Mr.
McCorrison might be comparable to Mr. McDorman, I think the
actual trajectory of his conduct within the conspiracy, both
how he became involved in it, the fact that he did not create
this scheme, that he was not one of its originators, and the
fact that he essentially demanded fairness among
co-conspirators in asking for a larger role, all of those
things to me indicate that Mr. McCorrison is not as culpable as
Mr. McDorman or as Mr. Ryan.

Mr. Santos is another individual who I think would
fall at the very top in terms of culpability.  Mr. Santos was
given a sentence of 25 months, and Mr. Santos I think was
another person who was very substantially involved, and more so
than Mr. McCorrison.

Of the remaining defendants, Michael McCaffrey, who
was given a sentence of six months, Rodney Scudder and Clifford

E6H8MCCS

Stringer, who were given sentences of time served, those

individuals, at least according to the government's information

and the evidence that we obtained in our investigation, and the

information we have received from cooperating witnesses, were

not as involved as Mr. McCorrison, but I think one point is

important to make, and that's the scope of Mr. McCorrison's

involvement in this conspiracy is known to the government in

part because Mr. McCorrison made the right decision and decided

to cooperate with this investigation.

So Mr. McCorrison, I think the truthfulness of his

proffer sessions with the government is shown not just by the

fact that he provided information about his codefendants, but

also, importantly, by the fact that he provided accurate and

robust disclosures about his own conduct.  And going back to a

point Ms. Benett made, I do believe wholeheartedly that Mr.

McCorrison has made, although he has made some bad decisions in

the past, his decision to cooperate indicates, I think both in

terms of his willingness to truthfully talk about his own

conduct and to disclose the information he knew about others, a

clean break from this circle of social acquaintances who led

him down the wrong path.

THE COURT:  Thank you very much.

I note that on page 21 of the presentence report the

amount of restitution is $200,000.  Is there any dispute about

that?

E6H8MCCS

1          MS. BENETT:  Your Honor, thank you for mentioning

2     that.  I was just looking back to the plea agreement, and maybe

3     Mr. Smith has a better recollection.  I don't think that there

4     was an agreed upon restitution amount.  I think there was a

5     forfeiture figure of $200,000.

6          THE COURT:  Page 21 says forfeiture is to be

7     determined by the government.

8          MR. SMITH:  It was our determination, your Honor, that

9     as a matter of obviously some estimating, that that was the

10    appropriate forfeiture and restitution number.  As the Court is

11    aware from other sentences in this case, it is the Department

12    of Justice's policy to use forfeiture as essentially a way by

13    which the government takes an interest in the restitution

14    amount.

15         THE COURT:  So you would seek forfeiture in the amount

16    of $200,000?

17         MR. SMITH:  That's correct.  What ordinarily happens

18    is through, I believe, the process called remission, what we do

19    is the forfeiture money we get, we then turn it over to the

20    victims, and it could be used to satisfy restitution.  We as an

21    office don't have the ability to say that that will happen, but

22    it generally happens in cases of this sort.  We don't double

23    take, so to speak, and I don't expect that to happen here.

24         THE COURT:  And just to finish up on cooperation, does

25    the government move pursuant to 5K1?

E6H8MCCS

1          MR. SMITH:  Yes, we do, your Honor.

2          THE COURT:  Thank you.  Granted.

3          MS. BENETT:  Thank you, your Honor.  I just wanted to

4     mention, with respect to an order of restitution, Mr.

5     McCorrison obviously will be limited somewhat in his future

6     employment, given that he does have a federal felony conviction

7     on his record, and I would ask the Court not to impose an order

8     of restitution that would be impossible for him to satisfy,

9     especially understanding that the forfeiture order, if

10    executed, could be used in order to compensate the victims in

11    this case.

12         THE COURT:  What do you have in mind as an appropriate

13    schedule?  What does your client earn presently?

14         MS. BENETT:  We have discussed the possibility of a

15    payment schedule of about $50 per paycheck, which because he

16    has different jobs, I would say it would amount to about $200 a

17    month.

18         THE COURT:  And if his income goes above a certain

19    point, I take it he could afford more?

20         MS. BENETT:  Yes.

21         THE COURT:  What does he now earn?

22         MS. BENETT:  Right now he is earning, approximately,

23    pretax about $2,000 a month.  So I think his take home is about

24    14 to $1500 a month.  He is contributing to the household

25    expenses of his sister, and he doesn't have a vehicle now.  He

E6H8MCCS

1    is hoping at some point to get one, and then there would be

2    additional vehicle payment costs, but his fixed costs are the

3    housing payments that he makes to his sister, his insurance,

4    and telephone.  So those come to somewhere a bit under a

5    thousand dollars a month.

6         THE COURT:  Would an appropriate schedule be $50 per

7    paycheck now, which you think will come to about 200 a month

8    given that he is earning pretax about 2,000 a month?

9         MS. BENETT:  Yes.

10        THE COURT:  And that when he begins to earn 4,000 a

11   month or more, he could pay $100 per paycheck?

12        MS. BENETT:  I think that sounds appropriate, your

13   Honor.

14        THE COURT:  All right.  Good.

15        MS. BENETT:  Thank you.

16        THE COURT:  I begin, as I must, by calculating the

17   advisory sentencing guideline total offense level.  It is 17,

18   as agreed by the parties and shown in the presentence report.

19   And Mr. McCorrison's criminal history category is III.  If I

20   were sentencing under the guidelines, I would depart downward

21   in light of his substantial cooperation with the government.

22        Moving to the 3553 factors, I note everything that

23   counsel and Mr. McCorrison have said, and I count on his father

24   and his sister to do what you tell me they have promised to do,

25   which is bring to probation's attention any resumption of

E6H8MCCS

1   gambling or illicit activity.

2            I think it's important to note that he came from a

3   troubled family situation, that his gambling may have had to do

4   with an addictive personality genetically transmitted, and I

5   think it's very important that he has paid already $7,213 in

6   restitution.

7            His cooperation, which severed his relationship with

8   his codefendants, is the most important part of my assessment

9   of his character.  It appears that he has truly turned a

10  corner.  The government, Mr. Smith, made a very strong

11  statement in Mr. McCorrison's support, both in describing the

12  cooperation Mr. McCorrison gave to the government, which

13  included having been prepared to testify against codefendants

14  either at trial or at a Fatico hearing, and to have given very

15  honest, or as the government said, accurate and robust

16  information with respect to his own involvement, which allowed

17  the government to get a fix on the amounts of money taken from

18  each victim, which was difficult because the victims either

19  were not forthcoming or had trouble discerning which of their

20  losses could be attributed to this crime.

21           So what you did was very important, Mr. McCorrison,

22  and I hope you feel proud of what you have done.  Your family

23  does too.  You have helped the government in a very important

24  way.

25           I believe that general deterrence is served by a

E6H8MCCS

1   non-incarcerative sentence, and I believe that individual

2   deterrence has already been accomplished.

3            In light of that, please stand, Mr. McCorrison.

4            I sentence you to time served on all counts.  You will

5   be on supervised release for three years on each count with

6   each term to run concurrently with each other.

7            I impose no fine because any money you have to repay

8   victims will need to go to forfeiture and restitution.

9            I am required to impose the special assessment of

10  $300, which I do now.

11           You may sit while I read you the conditions of

12  supervision.

13           The standard and mandatory conditions will apply.

14           In addition -- I am now reading from page 24 of the

15  presentence report -- you must provide your probation officer

16  with access to any requested financial information.

17           You may not incur new credit charges or open

18  additional lines of credit without the approval of your

19  probation officer unless you are in compliance with the

20  installment payment schedule that I will note in a moment.

21           You must participate in a mental health program

22  approved by the U.S. probation office.

23           Do you take prescribed medications?

24           THE DEFENDANT:  No, your Honor.

25           THE COURT:  I think this is designed for a different

E6H8MCCS

1    type of defendant.  I think what they have in mind is your

2    participating in Gamblers Anonymous, if they believe that is

3    necessary, and I will require you to do that if they find it

4    necessary.

5            You must submit your person, residence, place of

6    business, vehicle or any other premises under your control to a

7    search if your probation officer has reasonable belief that

8    contraband or evidence of a violation of the conditions of

9    release may be found.  The search must be conducted at a

10   reasonable time and in a reasonable manner.  Failure to submit

11   to a search may be grounds for revocation.  You must inform any

12   other residents that the premises may be subject to search

13   pursuant to this condition.  You will be supervised by the

14   district of residence.

15           Does the government have a list of victims and amounts

16   due to them?

17           MR. SMITH:  We do, your Honor.  I don't have it with

18   me now, but I will be providing it to chambers.

19           THE COURT:  So long as the clerk's office has it, I

20   can order payments to the clerk's office.

21           MR. SMITH:  Thank you, your Honor.

22           THE COURT:  I am required to impose restitution in the

23   amount of the losses suffered by the victims by virtue of Mr.

24   McCorrison's criminal conduct.

25           I impose forfeiture in the amount of $200,000.

E6H8MCCS

1          Let me ask Mr. Smith, should the $7,213 be taken from

2     that or is that in connection with a totally separate crime?

3          MR. SMITH:  I believe it was separate, your Honor, but

4     if I could have just a moment to confer with counsel.

5          MS. BENETT:  They were separate.

6          THE COURT:  So it should not be subtracted.

7          As Mr. Smith mentioned, forfeiture is usually remitted

8     to the victims, and so the amount of restitution that I impose

9     will not be in addition to forfeiture, but I do impose

10    restitution in the amount of $200,000.  It will be paid in

11    installments beginning 30 days from the date of judgment.  The

12    installments shall be as follows:

13         Mr. McCorrison will pay $50 per paycheck, which is

14    expected to be about $200 a month as long as he earns pretax

15    $2,000 a month.  When his income reaches $4,000 a month, he

16    must pay, I think it's reasonable to say, $400 a month in

17    restitution/forfeiture.

18         Is there anything further before I read Mr.

19    McCorrison's appeal rights?

20         MR. SMITH:  Nothing from the government, your Honor.

21         MS. BENETT:  Nothing from us, your Honor.

22         THE COURT:  Thank you.

23         Mr. McCorrison, I read every defendant his appeal

24    rights, and I will read yours now.

25         You can appeal your conviction if you believe that

E6H8MCCS

1   your guilty plea is somehow unlawful or involuntary or if there

2   is some other fundamental defect in the proceedings that was

3   not waived by your guilty plea.  You also have a statutory

4   right to appeal your sentence under certain circumstances.

5   With few exceptions, any notice of appeal must be filed within

6   14 days of judgment being entered in your case.  If you are not

7   able to pay the cost of an appeal, you may apply for leave to

8   appeal in forma pauperis.  If you request, the clerk of the

9   court will prepare and file a notice of appeal on your behalf.

10          I thank both counsel for your very useful submissions

11   in the case and your hard work.

12          Mr. McCorrison, I wish you good luck in the future.

13          THE DEFENDANT:  Thank you very, very much.

14                        oOo

15

16

17

18

19

20

21

22

23

24

25